UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


FLSMIDTH SPOKANE, INC.,        Case No. 1:13-CV-00490-EJL

            Plaintiff,        **MEMORANDUM DECISION
AND ORDER**

     v.

ANDREW EMERSON, et al.,

            Defendants.

---

This matter is before the Court on a Motion to Dismiss pursuant to Federal

Rule of Civil Procedure 12(b)(6) filed by Defendants Andrew Emerson and Material

Handling Solutions, LLC (collectively referred to hereinafter as "Defendants") (Dkt.

6). The parties have filed responsive briefing and the matter is ripe for the Court's

consideration. Having fully reviewed the record herein, the Court finds that the

facts and legal arguments are adequately presented in the briefs and record.

Accordingly, in the interest of avoiding further delay, and because the Court

conclusively finds that the decisional process would not be significantly aided by

oral argument, this motion shall be decided on the record before this Court without

oral argument.

# BACKGROUND[1]

Plaintiff FLSmith Spokane Inc., also d/b/a FLSmith Material Handling-North America ("FLS") is a worldwide project-based engineering company supplying material handling and other equipment, systems and services to the global cement and minerals industries.   On or about February 25, 2009, FLS entered into a Stock and Membership Interest Acquisition Agreement ("Acquisition Agreement") with a competitor, Conveyor Engineering, Inc. ("CEI"), Defendant Andrew Emerson ("Emerson"), a shareholder of CEI, and another shareholder of CEI, Roberto Maraboli ("Maraboli").   FLS acquired CEI and all of Emerson and Maraboli's interest in the goodwill of CEI under the Acquisition Agreement. Pursuant to Section 5.03 of the Acquisition Agreement, Emerson agreed to:

> [t]reat and hold as confidential (and not disclose or provide access to any Person to) all information relating to Trade Secrets, processes, Patent and Trademark applications, product development, price, customer and supplier lists, pricing and marketing plans, policies and strategies, details of client and consultant contracts, operations methods, product development techniques, business acquisition plans, new personnel acquisition plans and all other confidential information with respect to the Business…and the Acquired Companies[.]

(Dkt. 1, ¶ 4.5.)

---

1 Unless otherwise noted, all facts are taken from FLS' Complaint (Dkt. 1).   The Court must accept as true all of the factual allegations contained in a complaint when deciding a motion to dismiss.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In consideration for the purchase of his shares in CEI, Emerson also entered into a separate Confidentiality and Non-Competition Agreement ("Confidentiality Agreement") and a separate three-year written Employment Agreement ("Employment Agreement") with FLS.   On or about March 3, 2009, in accordance with the provisions of the Employment Agreement, Emerson became employed as President of CEI, which was then owned by FLS pursuant to the terms of the Acquisition Agreement.   CEI ultimately changed its name to FLSmidth Conveyor Engineering, Inc., and later to FLSmidth Boise, Inc.   Concurrently with the name change, Emerson became President and CEO of FLSmidth Boise, Inc., which later merged into Plaintiff FLS.

Pursuant to Section 7 of the Employment Agreement, Emerson agreed that during the term of the Employment Agreement, and indefinitely thereafter, he would preserve as confidential and would not use or disclose to any person not employed by FLS or its Affiliates, any trade secret, proprietary or other confidential information.[2]   In Section 8 of the Employment Agreement, Emerson also agreed to the following covenants:

---

2 Section 7 of the Employment Agreement defined confidential information as including but not limited to: products manufactured and services provided by FLS; the costs, prices and mark-up of such products or services; the processes utilized in the manufacture or provision of such products or services; engineering designs; the identity of customers, vendors, employees and consultants; computer software; computer programs; information concerning the products manufactured or services provided by FLS or any affiliate of FLS; the costs, prices and mark-up of such products or

(a) During the term of the Employment Agreement and for two years thereafter, Emerson shall not directly or indirectly on his own behalf or on behalf of any other person, engage, employ or solicit or seek to contract with, employ or solicit the services of any sales representative, dealer, distributor or employee of FLS or any affiliate.

(b) During the term of the Employment Agreement and for two years thereafter, Emerson shall not directly or indirectly work for or with or enter into, or remain in the service or employ (whether as principal, employee, director, consultant or in any other capacity) of any person, or engage or have a direct or indirect financial interest in any business or activity which competes with FLS or its affiliates.

(*Id.*, ¶ 4.14.)

Further, under the terms of the Confidentiality Agreement, Emerson agreed "not to use either the name of CEI, FLS or an Affiliate of either or any name similar thereto, in connection with his own or any other name or business in any way calculated to suggest that Emerson is (or has been) connected with FLS or CEI, nor in any way hold himself out in business solicitations as having had any such connection." (*Id.*, ¶ 4.18.) FLS paid Emerson "millions of dollars" in exchange for his agreement with such provisions. (Dkt. 12, p. 9.)

After Emerson's employment with FLS ended on April 9, 2013, FLS alleges Emerson participated in the formation of, and is employed by and has ownership interest in, Defendant Material Handling Solutions ("MHS"). FLS claims MHS

---

services; the processes utilized in the manufacture or provision of such products or services; engineering designs; the identity of customers, vendors, employees, consultants and others engaged by FLS or any affiliate in any capacity; and the business arrangements FLS or its affiliates had made or may make in the future. (*Id.*, ¶ 4.12.)

**MEMORANDUM DECISION AND ORDER - 4**

directly competes with FLS in Idaho, Chile, and perhaps in other worldwide locations. FLS also alleges that Emerson has actively and expressly held himself out on a worldwide basis on MHS' website as both former general manager of CEI and former employee of FLS, and as having experience with both companies that allows him to tackle projects around the world and to obtain better terms and prices of supplies in the United States on behalf of MHS clients.

In addition, FLS claims Emerson has directly or indirectly solicited former FLS employee Jeremy Holland to assist in the formation of, and to work for, MHS. Further, FLS alleges that while employed at CEI and FLS, and by virtue of his position as President and CEO, Emerson was exposed to all of FLS' confidential and proprietary information and trade secrets. FLS alleges Emerson is using or will inevitably use FLS' confidential and trade secret information to directly compete with FLS on behalf of MHS.

FLS filed the instant suit against Defendants on November 14, 2013. FLS' complaint alleges claims for breach of contract and breach of the implied covenant of good faith and fair dealing, violation of Idaho's Trade Secret Act, and Tortious Interference. Defendants now move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the motion will be **GRANTED** in part and **DENIED** in part.

# STANDARD OF REVIEW

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief may be granted for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal claim. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984). To sufficiently state a claim to relief and survive a 12(b)(6) motion, the pleading "does not need detailed factual allegations," however, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Rather, there must be "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement," but does require more than a sheer possibility that a defendant acted unlawfully. *Id.*

In *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), the Supreme Court identified two "working principals" that underlie *Twombly*. First, although a court must accept as true all factual allegations in a complaint when ruling on a motion to

dismiss, the court need not accept legal conclusions as true. *Id*. "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id*. at 678-79. Second, only a complaint that states a plausible claim for relief will survive a motion to dismiss. *Id*. at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*.

## ANALYSIS

### A.  Breach of contract claim

To state a claim for breach of contract, a plaintiff must plead the following elements: (1) the existence of a contract; (2) breach by the defendant; (3) the breach caused damages and (4) the amount of damages. *Edged In Stone, Inc. v. Northwest Power Sys., LLC*, 321 P.3d 726, 731 (Idaho 2014). FLS alleges the existence of an Acquisition Agreement, Confidentiality Agreement, and Employment Agreement (collectively referred to hereinafter as "relevant agreements") between FLS and Emerson. FLS claims Emerson breached such agreements by, *inter alia*, using his name in connection with FLS or CEI's name in business solicitations, directly competing with FLS, soliciting or employing FLS' former employee, and divulging

FLS' confidential information and trade secrets.   Finally, FLS alleges it has been damaged as a result of Emerson's breach in an amount to be proven at trial, but exceeding $75,000.

Defendants suggest FLS' Complaint contains "no factual specificity regarding any conduct defendant Emerson has engaged in that could plausibly be construed as a breach" of the Employment Agreement's non-compete and non-solicitation clauses.   (Dkt. 6-1, p. 8.)   Defendants also fault FLS for alleging "upon information and belief" that Emerson is "perhaps" in competition with FLS in various places around the world, that Emerson "at an unspecified time and place somehow either directly or indirectly solicited one of Plaintiff's employees to join MHS," and that Emerson "used and disclosed trade secrets belonging to Plaintiff, in some undisclosed manner at an undetermined time and place."   (*Id.*)

It is true that FLS' allegations, at least with respect to MHS' alleged competition with FLS and Emerson's use of trade secrets, lack factual specificity to support the reasonable inference that Emerson is liable for breach of contract.   For instance, the Complaint does not provide facts to support MHS' alleged competition with FLS, and does not identify how, when, or where Emerson either used or disclosed FLS' trade secrets.   However, FLS does provide sufficient allegations to

support the inference that Emerson breached other provisions of the relevant agreements.

Specifically, FLS alleges Emerson agreed, in Section 8 of the Employment Agreement, during the term of the Employment Agreement and for two years thereafter, not to directly or indirectly engage, employ or solicit the services of any FLS employee. (Dkt. 1, ¶ 4.14.) FLS also alleges that Jeremy Holland, an FLS employee, left FLS and went to work for MHS, Emerson's new company, within the time period covered under the Employment Agreement. (*Id.*, ¶ 4.26.) Although FLS does not allege specific facts to demonstrate solicitation, the Employment Agreement does not simply prohibit solicitation of FLS' employees, but also restricts any employment of FLS' employees, either direct or indirect. FLS has adequately alleged Emerson breached the Employment Agreement by employing Mr. Holland.[3]

In response to Defendants' Motion to Dismiss, FLS provided various documents, including MHS' registration with the Idaho Secretary of State and excerpts from MHS' website, to establish that Jeremy Holland in fact works for MHS. (Dkts. 13-1, 13-2.) Although, when ruling on a motion to dismiss, a court must generally convert a Rule 12(b)(6) motion into one for summary judgment under Rule 56 if the court considers evidence outside of the pleadings, a court may

---

3 FLS may uncover additional facts to suggest solicitation once it has had the benefit of discovery.

consider certain materials, such as documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice, without converting the motion to dismiss into one for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 907-908 (9th Cir. 2003). A court may take judicial notice of information announced on a party's website, as long as the website's authenticity is not is dispute and is capable of accurate determination. *Swisher v. Collins*, 2008 WL 687305, at *23 n. 29 (D. Idaho 2008) (*citing Doron Precision Systems, Inc. v. FAAC, Inc*., 423 F.Supp.2d 173, 179 n. 8 (S.D.N.Y. 2006)). A court may also take judicial notice of public records such as documents filed with the Secretary of State. *No Cost Conference, Inc. v. Windstream Communications, Inc*., 940 F.Supp.2d 1285, 1296 (S.D. Cal. 2013). The Court accordingly takes judicial notice of the excerpts from MHS' website and MHS' registration with the Idaho Secretary of State,[4] and notes such documents illustrate that former FLS employee Jeremy Holland worked for MHS during the time period prohibited under the Employment Agreement, constituting a breach of that agreement.[5]

---

4   As the additional documents accompanying FLS' response to Defendants' Motion to Dismiss do not appear to satisfy the criteria for judicial notice, the Court declines to consider such documents for purposes of the present motion.

5  Contrary to Defendants' claims, FLS has not simply asked the Court to "infer" that Jeremy Holland is employed with MHS, but has instead presented evidence to establish such inference is plausible.   (Dkt. 19, p. 7.)

Under the terms of the Confidentiality Agreement, Emerson also agreed not to use either the name of CEI, FLS, or an affiliate of either, in connection with his own name or any other name or business in any way calculated to suggest Emerson's connection with FLS or CEI, nor to in any way hold himself out in business solicitations as having had any such connections.  (Dkt. 1, ¶ 4.18.)   The Complaint alleges Emerson has actively and expressly held himself out on MHS' website as the former General Manager of CEI, and as a former employee of FLS.   (*Id*., ¶ 4.25.) The Complaint also alleges Emerson has represented, through the MHS website, that his experience with both CEI and FLS prepared him to better tackle projects around the world, and to obtain better terms and prices of supplies on behalf of MHS and its clients.  (*Id*.)   Excerpts from the MHS website illustrate that Emerson has used his name in connection with both the names of CEI and FLS in a public setting.   (*See, e.g*., Dkt. 13-2, describing Emerson as "Former President of Conveyor Engineering USA and equity partner, who has continued in a similar capacity over the last several years for the multinational firm FLSMIDTH.").   FLS has accordingly adequately alleged facts to suggest Emerson breached the Confidentiality Agreement.

Defendants also fault Plaintiff for failing to specify any specific harm Plaintiff suffered as a result of Emerson's alleged breach.   However, the Complaint alleges Plaintiffs have incurred greater than $75,000 in damages as a result of Emerson's

breach and that FLS has been and will continue to be severely and irreparably damaged as a result of Emerson's breach. (Dkt. 1, ¶¶ 2.1, 4.16, 5.7.) Moreover, the Complaint alleges Emerson's Employment Agreement contained an irreparable harm provision, under which Emerson acknowledged that FLS would suffer substantial harm by reason of a breach of the Agreement, but that monetary damages may be impossible to calculate. (Dkt. 1, ¶ 4.16.) Emerson thus agreed that in the event of any breach or threatened breach, FLS would be entitled to seek equitable relief in addition to monetary damages. The Employment Agreement also provided that the prevailing party in any legal action between the parties shall be entitled to reimbursement of its court costs and attorneys' fees. (Id., ¶ 4.17.) Defendants thus have knowledge of the actual damages undergirding Plaintiff's breach of contract claim.

Further, the measure of damages for breach of a non-compete agreement is the amount that plaintiff lost by reason of the breach. *Trilogy Network Systems, Inc. v. Johnson*, 172 P.3d 1119, 1121 (Idaho 2007). The measure of damages for loss of profits is "rarely susceptible of accurate proof[.]" *Id*. (quoting *Ryska v. Anderson*, 214 P.2d 874, 876 (Idaho 1950)). Therefore, to establish liability for breach of a non-compete agreement:

> the law does not require accurate proof with any degree of mathematical certainty. Damages need be proved only with a reasonable certainty, and this

means that the existence of damages must be taken out of the realm of speculation. The mere fact that it is difficult to arrive at an exact amount of damages, where it is shown that damages resulted, does not mean that damages may not be awarded; it is for the trier-of-fact to fix the amount. The profits realized by the defendant may be considered by the trier-of-fact, if shown to correspond with the loss of the plaintiff.

*Id*. (internal quotations, citations and brackets omitted).

Thus, even at the summary judgment stage, damages for breach of a non-compete agreement need only be established with reasonable certainty. At this early stage of the proceedings, and without the benefit of discovery, FLS cannot be faulted for failing to allege damages with greater specificity. While FLS could have more fully detailed its damages, any failure to do so at this point does not justify dismissal of its breach of contract claim. The Court accordingly denies Defendants' motion to dismiss Plaintiff's breach of contract claim.

## 1. *Good faith and fair dealing*

Idaho law recognizes a cause of action for breach of an implied covenant of good faith and fair dealing; "[s]uch a covenant is found in all employment agreements, including employment at-will relationships." *Wesco Autobody Supply, Inc. v. Ernest*, 243 P.3d 1069, 1079 (Idaho 2010) (quoting *Cantwell v. City of Boise*, 191 P.3d 205, 213 (Idaho 2008)); *see also Idaho First Nat. Bank v. Bliss Valley Foods, Inc.*, 824 P.2d 841, 862 (Idaho 1991) (hereinafter "*Bliss*") ("[g]ood faith and fair dealing are implied obligations of every contract") (citation omitted); *Sorenson*

*v. Comm. Tek, Inc.*, 799 P.2d 70, 75 (Idaho 1990) ("[a]ny action by either party which violates, nullifies or significantly impairs any benefit of the employment contract is a violation of the implied-in-law covenant."). An implied covenant of good faith and fair dealing requires "that the parties perform in good faith the obligations imposed by their agreement." *Bliss*, 824 P.2d at 864 (citations omitted). Here FLS has adequately alleged Emerson violated several provisions of his Employment Agreement. As a breach of contract is a violation of the implied covenant, the Court denies Defendants' motion to dismiss FLS' breach of the implied covenant of good faith and fair dealing claim.[6] *Id.*

## B. Trade Secret

The Idaho Trade Secrets Act ("ITSA") provides for damages or injunctive relief if a plaintiff's trade secret is misappropriated by another. I.C. §§ 48-801 *et. seq.* Misappropriation is defined under the ITSA as:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(A) Used improper means to acquire knowledge of the trade secret; or

---

6 Of course, FLS' breach of the implied covenant of good faith and fair dealing claim does not result in a cause of action separate from the breach of contract claim, nor would it result in separate contract damages unless such damages specifically relate to the breach of the good faith covenant. *Id.* "To hold otherwise would result in a duplication of damages awarded for breach of the same contract." *Id.*

(B) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

(i) Derived from or through a person who had utilized improper means to acquire it;

(ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Id*. § 48–801(2).

The term "trade secret" means "information, including a formula, pattern, compilation, program, computer program, device, method, technique, or process" that "[d]erives independent economic value ... from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." I.C. § 48–801(5). Improper means, in turn, "include theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." I.C. § 48–801(1).

Thus, to establish a *prima facie* case of a violation of the ITSA, a plaintiff must adequately allege that a defendant acquired a trade secret by "improper means"

or that a defendant disclosed or used the trade secret without consent and with knowledge that the trade secret was acquired by improper means or under circumstances giving rise to a duty to maintain secrecy.[7]  *JustMed, Inc., v. Byce*, 600 F.3d 1118, 1129 (9th Cir. 2010).   As Defendants note, the Complaint lacks specificity regarding what trade secrets FLS believes Emerson actually acquired and by what means such trade secrets were allegedly disclosed.   (Dkt. 6-1, p. 10.) FLS responds that the scope of information Emerson was bound to hold confidential is defined within the contracts, that such definitions are expansive and extremely detailed, and that the definitions provide the parameters and context for what Emerson has improperly used as alleged in the Complaint.   (Dkt. 12, p. 9.)   Section 5.03 of the Acquisition Agreement, for instance, required Emerson to hold as confidential price, customer and supplier lists, pricing and marketing plans, policies and strategies, etc.   (Dkt. 1, ¶ 4.5.)

There is no question that customer lists and pricing and marketing plans may constitute a trade secret, if such information is not generally known to or readily ascertainable by proper means by other persons, and is subject to reasonable efforts to maintain its secrecy.   *Northwest Bec-Corp. v. Home Living Serv*., 41 P.3d 263, 267 (Idaho 2002); *Sky Capital Group, LLC v. Rojas*, 2009 WL 1390938, at *3 (D.

---

7   If Emerson acquired trade secret information through his capacity as an employee of FLS, such circumstances "give[] rise to a duty to maintain its secrecy or limit its use."   *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1129 (9th Cir. 2010) (quoting I.C. § 48-801(2)(b)(B)(ii)).

Idaho 2009).   However, the Complaint contains no non-conclusory facts to suggest FLS' confidential information, including its customer lists and pricing and marketing plans, are not readily known or ascertainable to others, and does not provide any evidence regarding FLS' efforts to maintain the secrecy of such information.   The Court cannot infer FLS' confidential information derives independent economic value from not being generally known in the absence of such allegations.   I.C. § 48-801(5)(a)-(b).   Although FLS restricted Emerson's use of such information, the Court is without evidence of any other measures FLS has taken to protect its alleged trade secrets.   Without allegations to establish its customer lists, pricing and marketing plans and other confidential information meet the definition of a trade secret, FLS has failed to adequately allege a claim for violation of the ITSA.

Further, the Complaint also fails to allege specific facts regarding Emerson's alleged disclosure or use of such trade secrets, including how, when and where any such disclosure took place.   An ITSA plaintiff may establish "use" of a trade secret by alleging any exploitation of a trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant.   *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1130 (9th Cir. 2010).   "Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade

secret to assist or accelerate research or development, or soliciting customers through the use of the information that is a trade secret all constitute 'use.'" *Id.* (quoting Restatement (Third) of Unfair Competition § 40 (1995)). FLS alleges FLS and MHS are competing in the same markets and performing the same functions, and that the Court "can reasonably infer that Defendant Emerson did not revolutionize the medium and large mining business overnight, but instead, is more likely than not using confidential and protected information from either CEI or FLS in violation of his agreements." (Dkt. 12, p. 10.)

Contrary to MHS' claims, Emerson's work for an allegedly competing company does not, without more, establish that Emerson misappropriated trade secrets. As the Idaho Supreme Court affirmed in *Northwest Bec-Corp. v. Home Living Serv.*, 41 P.3d 263, 268 (Idaho 2002), the legislature did not intend I.C. § 48-801(2) to be read so broadly "as to preclude the hiring of an employee from a competitor; the legislature also did not intend that merely hiring a competitor's employee constitutes acquiring a trade secret." [8] Further, "[a]n employee will

---

8 FLS also suggests the Court should accept the "inevitable disclosure" doctrine adopted by the Seventh Circuit in *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). However, the "inevitable disclosure" doctrine has not been adopted in Idaho or in the Ninth Circuit. *See, e.g., Northwest Bec-Corp.*, 41 P.3d at 269 (plaintiff's reliance on the *PepsiCo* inevitable disclosure doctrine to establish misappropriation was inadequate to survive motion for summary judgment); *Allied North America Ins. Brokerage Corp. of California v. Woodruff-Sawyer*, 2005 WL 6583937, at *13, n. 14 (N.D. Cal. 2005) ("it appears that the inevitable disclosure doctrine articulated [in *PepsiCo*] is not the law of the State of California or the Ninth Circuit[.]") (citing *Danjang LLC v. Sony Corp.*, 1999 WL 675446, at *16 (C.D. Cal. 1999)).

naturally take with her to a new company the skills, training and knowledge she has acquired from her time with her previous employer. This basic transfer of information cannot be stopped unless an employee is not allowed to pursue her livelihood by changing employers." *Id.* Thus, in order to adequately allege a misappropriation claim, FLS cannot simply rely on the allegation that Emerson now works for a supposed competitor.

Without any further allegations to suggest Emerson actually used FLS' trade secrets, or to even establish that FLS' information constitutes a trade secret in the first place, FLS' ITSA claim fails to cross the line from possible to plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). FLS' ITSA claim is accordingly dismissed without prejudice.[9]

### C. Tortious Interference with Contract

A *prima facie* case of tortious interference with contract requires a plaintiff to prove:

> (a) the existence of a contract between plaintiff and a third party; (b) knowledge of the contract on the part of the defendant; (c) intentional

---

9 Where, as here, the pleading could be cured by the addition of other facts, dismissal pursuant to Rule 12(b)(6) should ordinarily be without prejudice. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1108 (9th Cir. 2003).

interference causing a breach of the contract; and (d) injury to plaintiff resulting from the breach.[10]

*Bliss*, 824 P.2d at 858-59 (citing *Barlow v. Int'l Harvester Co.*, 522 P.2d 1102, 1114 (Idaho 1974)); *see also Cantwell v. City of Boise*, 191 P.3d 205, 216 (Idaho 2008).

FLS suggests MHS wrongly interfered with the "substantial and valuable contractual obligations and duties" Emerson owed to FLS.   (Dkt. 1, ¶ 7.2.) However, to state a claim for tortious interference with contract, the alleged interferer must be a third party to the contractual relationship.   *Cantwell*, 191 P.3d at 216 (*citing BECO Contr. Co. v. J-U-B Eng'rs*, 184 P.3d 844, 849-51 (Idaho 2008)).   A party cannot interfere with its own contract.   *Ostrander v. Farm Bureau Mut. Ins. Co. of Idaho, Inc.*, 851 P.2d 946, 950 (Idaho 1993) (citations omitted). Although FLS alleges MHS interfered with Emerson's relevant agreements, "actions of an agent are the actions of the corporation; an agent is only liable for actions which are outside its scope of duty to the corporation."   *Id.*   Since, as founder and CEO of MHS, Emerson's alleged actions presumably fell within the scope of his authority as an agent for MHS, there was no third party to the contract, and FLS cannot state a claim for tortious interference with contract.   *Id.*

Finally, FLS also appears to raise a claim for intentional interference with prospective economic advantage, as the Complaint states Defendant MHS

---

10 Once a plaintiff has established a *prima facie* case, "the burden is on the defendant to prove justification."   *Id.* at 859.

"tortiously interfered with the business expectancies of Plaintiff FLS[.]" (Dkt. 1, ¶

7.3.) The elements of a cause of action for interference with prospective economic

advantage are:

> (1) [T]he existence of a valid economic expectancy; (2) knowledge of the expectancy on the part of the interferer; (3) intentional interference inducing termination of the expectancy; (4) the interference was wrongful by some measure beyond the fact of the interference itself, and (5) resulting damage to the plaintiff whose expectancy has been disrupted. [11]

*Wesco Autobody Supply, Inc. v. Ernest*, 243 P.3d 1069, 1081 (Idaho 2010) (citing

*Cantwell*, 191 P.3d at 216).

FLS fails to identify any specific economic expectancy with which MHS

allegedly interfered, and nowhere suggests that it lost any particular business

expectancy as a result of MHS' alleged interference. Thus, to the extent FLS raises

a claim for intentional interference with prospective economic advantage, such

claim is not adequately alleged and is dismissed without prejudice.

## ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED:

1. Defendants' Motion to Dismiss Plaintiff's Complaint (Dkt. 6) is

   **GRANTED** in part and **DENIED** in part.

---

[11] The torts of intentional interference with prospective economic advantage and intentional interference with contract are similar. As such, the "cases and commentary addressing the two torts often apply interchangeably for providing the common elements." *Cantwell*, 191 P.3d at 216, n. 5.

2. Defendants' Motion to Dismiss Plaintiff's breach of contract and breach of the implied covenant of good faith and fair dealing claim is **DENIED**.

3. Defendants' Motion to Dismiss Plaintiff's ITSA cause of action is **GRANTED**.   Plaintiff's ITSA claim is **DISMISSED WITHOUT PREJUDICE**.

4. Defendants' Motion to Dismiss Plaintiff's tortious interference with contract and intentional interference with prospective economic advantage claim(s) are **DISMISSED WITHOUT PREJUDICE**.

SO ORDERED.

DATED: June 16, 2014

Edward J. Lodge
United States District Judge